209 So.2d 581 (1967)
DELTA PAVING COMPANY
v.
Elmer WOOLRIDGE, d/b/a Woolridge Construction Company, Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc. and English Realty Co., Inc.
No. 2529.
Court of Appeal of Louisiana, Fourth Circuit.
May 1, 1967.
On Rehearing April 8, 1968.
Writ Refused May 17, 1968.
*584 Deutsch, Kerrigan & Stiles, Ralph L. Kaskell, Jr., New Orleans, for plaintiff-appellant.
Phelps, Dunbar, Marks, Claverie & Sims, Charles M. Lanier, New Orleans, for defendant-appellant.
Richards, Scott & Hoepffner, G. Harrison Scott, New Orleans, for defendants-appellees.
Before REGAN, SAMUEL, and HALL, JJ.
REGAN, Judge.
The plaintiff, Delta Paving Company, filed this suit against the defendants, Elmer Woolridge, d/b/a Woolridge Construction Company, who was the general contractor engaged to erect a motor freight terminal for the other defendants, English Realty Company, owner of the site on which the terminal was to be constructed, and its allied companies, Red Ball Motor Freight, Inc., and Red Ball Motor Freight Southeast, Inc., who were to occupy and use the terminal.
Plaintiff is endeavoring to recover the sum of $46,284.80 of which $45,098.51 is said to be the balance due for work actually performed in conformity with the terms of paving contract entered into with Elmer Woolridge and $1,186.29 is asserted to be the amount of profits estimated to have been lost as a result of Delta's being prevented from completing the contract.
The defendants answered admitting the existence of an agreement between Delta and Woolridge, but denied that Delta was entitled to the recovery of any additional payment because of its failure and refusal to complete the contract and since the work performed was defective.
The defendant, Woolridge, filed a cross claim against English in an endeavor to recover any amount which may be awarded against it in favor of Delta, and $56,492.88 representing the balance due it for work performed prior to termination of its contract, $5,500.00 as profits which it would have made had English not wrongfully terminated its agreement, and $1,500.00 as costs incurred in connection with the performance of the paving requirement of its contract.
In addition, Woolridge filed a reconventional demand against Delta for this balance and loss of profits should he be unable to recover them from English, insisting that their loss was due to Delta's failure to perform its task in a workmanlike manner.
English answered the cross claim admitting its indebtedness of $56,492.88 to Woolridge but counter claimed against both Woolridge and Delta in an effort to recover $55,069.46 as reimbursement of this amount which it expended in replacing and/or restoring the defective paving done by Delta.
Woolridge then counter claimed against Delta for any sum of money for which it may be cast in judgment in favor of English Realty Co., Inc., whether by set-off, compensation or otherwise.
Delta and Woolridge both deny that English is entitled to any reimbursement, since they insist that the new work performed by English was unnecessary and that it was not of the same nature required to be performed under the agreement with Delta, and of more importance, that English had wrongfully refused to permit the job to be remedied and completed by Woolridge and Delta. However, Woolridge also contended that he alone was wrongfully refused the right to complete the work in that Delta had already refused to do so.
*585 Following a trial on the merits, the lower court rendered a judgment[1] which permitted Delta to retain the sum of $35,256.90 previously paid on account of the contract and dismissed its suit, and in favor of Woolridge for recovery of $56,804.69 from English Realty Company which amount represented the balance due on the general contract at the time that it was abruptly terminated by English less $3,525.69 which was a 10% commission charged for faulty work on Delta's paving subcontract. In addition thereto, the demands of Red Ball and/or English Realty were rejected except as to the above credit allowed for the amount it was to pay Woolridge.
From that judgment, both Woolridge and Delta have prosecuted this appeal. English Realty Co., Inc., Red Ball Motor Freight, Inc., and Red Ball Motor Freight Southeast, Inc., have neither appealed nor answered the appeal.
The record which is excessively voluminous discloses that following the acquisition of the property on the corner of Almonaster and Desire Streets by English Realty Co., Inc., both Red Ball and English engaged the services of Dahl, an architect and engineer from Texas, to prepare plans and specifications for a Red Ball Motor Freight terminal which was to be erected on that site and to secure soil boring reports from Eustis Engineering Company.
These reports disclosed that this site was in a low lying area near the Industrial Canal in the City of New Orleans. The soil is generally wet in this area, does not drain well, and has poor weight bearing characteristics. The testimony inscribed in the record also reveals that the soil in this region is inferior and possesses few favorable building qualities. In view of these facts, Dahl specified that the general contractor would be required to remove unsuitable fill from the site, provide for drainage during construction regardless of the source of the water, compact the fill, prepare the subgrade for paving to 95% maximum density, and remove soft and unsuitable material. In conjunction with those specifications, Dahl provided for an eight inch sand shell base and three inches of asphalt paving.
Red Ball-English then solicited bids from a number of general contractors, who in turn secured subbids from Delta and others for the base and paving work. These bids were rejected since they exceeded the amount which English and Red Ball were prepared to spend. The bids ranged between $825,000.00 and $875,000.00.
On or about May 13, 1963, Red Ball-English decided to enter into an oral contract with Elmer Woolridge, who had performed other work for them, to construct a practical, relatively cheap terminal at cost plus 10%.
Don Kirk, a Fort Worth architect, was nominally employed by Woolridge; however, Red Ball-English were intimately involved in the preparation of the plans and specifications. Kirk had the advantage of Dahl's plans in drafting his own specifications in 1963. Kirk's specifications are silent on the subject of site drainage during construction which, of course, is a matter of some importance considering the characteristics of the soil in this area. He required that Woolridge use only clean earth for the top twenty-four inches of exterior fills and specified, as did Dahl, the same eight inches of sand shell base and three inches of asphalt. Predicated on these plans, Woolridge obtained several bids and eventually awarded the paving subcontract to Delta on July 17, 1963, which provided that Delta was to install the sand shall base and asphalt specified by Woolridge and *586 Kirk on sand subgrade previously prepared by Woolridge.
Work was commenced by Woolridge during the early summer of 1963, but Delta was not permitted to begin its paving until late in February of 1964, at which time New Orleans had previously experienced and was then experiencing unusually rainy weather. Woolridge had initially prepared the fill and sand subgrade in July and August of 1963, during the rainy season, and it had remained, more or less, wet. The design of the parking area had not included provisions for on-site or subsurface drainage of the job during construction so that the sand shell base which was to be installed by Delta and the subgrade and fill which was prepared by Woolridge would be free of rain and other waters. The condition also appeared to be aggravated by Kirk's curb and gutter design around the perimeter, which seemed to trap rain water in the terminal area by turning it into a shallow bowl surrounded on all sides by impervious clay.
On January 1, 1964, with the job site in this relatively unsatisfactory condition for paving, Red Ball-English, who were confronted with the possibility of eviction from the old terminal which they had already sold, began to press for delivery of the new facility which Woolridge said would be completed on or about January 1, 1964. Woolridge then ordered Delta to begin its work in late February. Some knowledge of the possibility that the work of Delta might not prove to be satisfactory due to the condition of the area is evidenced by the inquiry made by Woolridge of Delta as to whether he would receive from it the same one year maintenance guarantee he had customarily received from Delta's parent company, the Texas Bitulithic Corporation. Delta's concern over the durability of the paving is indicated by virtue of the contents of a letter wherein it advised the general contractor that his paving design represented the bare minimum under the circumstances; however, Delta said that it would stand behind the job should any part thereof fail as a result of its fault.
Delta asserts that it repeatedly informed Woolridge and his general superintendent in charge of construction, Wilson Musgrove, that the subgrade prepared by Woolridge was wet and that the prevailing conditions were not entirely satisfactory for paving; however, at their insistence, which Woolridge denies, and despite the foregoing adverse factors, Delta did lay the sand shell base and asphalt to meet the contractor's standard specifications in this area. Moreover, the testing expert of Woolridge agreed that the work performed by Delta complied with these specifications. Under pressure from Woolridge, Delta concedes that in every way it endeavored to expedite the paving, and that the area was completed on May 2, 1964.
Red Ball occupied the terminal the same weekend of May 2, 1964, and began using the entire area, both the completed and incompleted portions thereof. Within a week or ten days, there was evidence of failure of the asphalt; however, despite the failure thereof, Red Ball continued to use the area, thus contributing to more extensive damage.
During the months of May and June of 1964, Delta and Woolridge both expended time and money in an effort to ascertain the nature of the defects in the work and to determine what were the proper curative measures to pursue. Both Red Ball and English were fully cognizant of these efforts. Various tests and inspections made by experts in the field resulted in the conclusion that the wet fill or subgrade under the sand shell base could be cured and the areas of damaged pavement replaced at a cost of about $5,000.00. A testing laboratory found that the curb was acting as a water barrier trapping water in the parking area, and that the release of this water would have to be accomplished by ditching or piping. Woolridge then spent about $1,000.00 in executing this recommendation.
Delta was of the opinion that subdrains were necessary in order to remove the *587 trapped water; however, it insisted that it was not responsible for the presence of water in the area. In any event, Delta stated that it was willing to assume part of the cost thereof even though the condition was not its fault. On or about July 10, 1964, Delta informed Woolridge and Red Ball-English of its findings, made reports thereof available, and offered to cooperate. However, Delta was never contacted by Red Ball-English with respect to the work, nor was it requested or permitted to go forward with the repair thereof. To the contrary, no notice was given to either the sub or the prime contractor, that is, Delta or Woolridge; Red Ball-English simply engaged a civil engineer to redesign the entire area irrespective of costs and irrespective of the existing contracts.
Red Ball-English called a nebulous conference with Woolridge in July of 1964, in the City of Dallas, for the ostensible purpose of determining the proper course to pursue in remedying the defective paving. Delta was not notified thereof nor was it represented at the meeting. Following a discussion between Woolridge and several of the vice-presidents of Red Ball-English, Mr. English, the owner, entered the conference room and summarily terminated the contract with Woolridge. He removed both Woolridge and Delta from the job without initially putting either in default or consulting them. Under English's new paving contract, almost all of the work done by Delta was destroyed, and the paving, to reiterate, was now performed under totally different plans and specifications than had been prepared for Woolridge and Delta. The final paving job used the previous work and material of Delta as fill and subbase and a substantial amount of heavy, reinforced concrete was laid which, of course, formed no part of the original plans and specifications. The cost thereof amounted to about $111,000.00.
Incidentally, the record discloses that the original contract between Red Ball-English and Woolridge was not recorded; therefore, Delta recorded its privilege, in order to preserve its personal claim against English for the unpaid balance.[2]
The lower court found as a fact that Delta was at fault in applying the asphalt materials on a subbase which was overly moist. It also found that Woolridge was at fault in not providing, in every respect, an adequate subbase for the asphalt.
However, the testimony adduced herein, despite the foregoing findings of fact, clearly discloses that both Delta and Woolridge has substantially performed their respective agreements.
The law is clear that substantial performance of a construction contract is adequate and prevents the contractor from being guilty of a breach thereof.[3] Moreover, if the contractor does not perform the necessary remedial work to eliminate any defects in the construction performed by him, the owner is merely entitled to recover for whatever the cost of such remedial work might be.
It is likewise clear that before the owner may terminate a contract and complete the construction thereof, the contractor must be placed in default.[4] In short, the putting in default serves as a basis and hypothesis for the remedial work being performed by the owner or someone other than the contractor.
Moreover, if an owner does in fact complete the remedial work to be done on a construction contract, he may only *588 offset against the fee of the contractor the cost of the remedial work. He may not attempt to offset cost of performing the work again under a set of plans and specifications that are completely and entirely different from the original contract. In short, once substantial performance has been rendered on a construction contract, the cost of a new work cannot be offset against the amounts due to the contractor.[5] In this case, the evidence clearly discloses that the work which Red Ball-English had performed after the abrupt termination of the contract with Woolridge and Delta was of a completely different nature than that contracted for originally. The construction subsequent to the termination of the original contract was of reinforced concrete, which acted as a floating bridge on the subbase which consisted of broken pieces of Delta's asphalt.
The testimony adduced herein convinces us that Delta had substantially performed its contract and that the lack of drainage under the property was cured by Woolridge at a cost of approximately $1,000.00, and the cost of the 817 square yards of asphalt which had to be replaced would amount to about $4,000.00. Consequently, Delta should recover the amount of $45,098.51, which was the balance due under the contract, subject to a credit of $4,000.00 for the cost of the remedial work which would have been done had English proceeded in the customary manner to cure or have some one cure the defects in the asphalt paving. It thus additionally follows that any amount owed by Red Ball-English to Woolridge under the cost plus 10% contract should be reduced by $400.00 representing 10% of the value of this remedial work.
Delta seeks judgment solidarily against both Red Ball-English and Woolridge for the amount due. To reiterate, Delta has a personal right of action against the owner since it recorded its privilege under an unrecorded construction contract. Moreover, it has a contractual relationship with Woolridge under which it is entitled to recover for the balance due. However, while Woolridge is liable to Delta for the unpaid balance due on the contract, it is only technically liable since the true cause of nonpayment to Delta was the action of Red Ball-English in terminating the contract.[6] Therefore, since Woolridge is only technically liable on the contract, he should have judgment over against Red Ball-English on his third party petition for any amounts which he may have to pay Delta.
Since no appeal was perfected herein by Red Ball-English, its claim for the cost of the new concrete work asserted against Delta and Woolridge, which was decided adversely to it in the lower court, is not now posed for our consideration. In addition thereto, this fact renders inconsequential the reconventional demand by Woolridge against Delta requesting indemnity in the event that English did recover against him. Moreover, a stipulation by the parties in the lower court as to the actual balance owed by Red Ball-English to Woolridge under the general contract eliminates the necessity for a decision by us on Woolridge's demand and on the reconventional demand by Woolridge against Delta seeking recovery thereon from Delta if no recovery could be obtained from English.
For the foregoing reasons, the judgment of the lower court is amended to read as follows:
Judgment is hereby rendered in favor of Delta Paving Company and against Elmer Woolridge, d/b/a Woolridge Construction Company, Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc., and English Realty Company, Inc., solidarily in the full sum of $41,098.51, together with *589 interest thereon from date of judicial demand until paid.
Judgment is further rendered herein in favor of Elmer Woolridge, d/b/a Woolridge Construction Company and against Red Ball Motor Feight, Inc., Red Ball Motor Freight Southeast, Inc., and English Realty Company, Inc., solidarily for any amount which Woolridge may be forced to pay Delta Paving Company pursuant to this judgment.
Judgment is further rendered herein in conformity with the stipulation of the parties in favor of Elmer Woolridge, d/b/a Woolridge Construction Company and against Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc., and English Realty Company, Inc., in the full sum of $56,804.69, subject to a credit of $400.00 representing Woolridge's 10% commission under its cost plus contract of the amount credited to the account of Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc., and English Realty Company, Inc., for the necessary remedial work, together with interest from date of judicial demand until paid.
All costs of this proceeding are to be paid by Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc., and English Realty Company, Inc.
Amended and affirmed.
Before REGAN, SAMUEL, CHASEZ, HALL, BARNETTE and JANVIER, JJ.

ON REHEARING
CHASEZ, Judge.
We granted this rehearing, limiting its scope to a review of quantum in the awards to Delta Paving Company, Plaintiff-Appellant (referred to as Delta) and Elmer Wooldridge, d/b/a Wooldridge Construction Company, Defendant-Appellant and Third Party Plaintiff, (referred to as Wooldridge).
With respect to Delta, we now reconsider whether it was entitled to recover attorney's fees as an element of damages, and interest on the unpaid balance of the contract at the rate of 8% per annum.
Delta's claim for attorney's fees is based on the following provision in its contract with Wooldridge:
"Upon completion of the work to be performed by us, you will make final payment to us immediately upon receipt of our invoice and do agree to pay interest on any amount which remains unpaid ten (10) days after date of billing at the rate of eight per centum (8%) per annum, together with a reasonable attorney's fee and cost of collection, if incurred."
The prime contractor, Wooldridge, and defendants English Realty Co., Inc. (referred to as English), Red Ball Motor Freight, Inc. and Red Ball Motor Freight Southeast, Inc., (referred to as Red Ball), urge attorneys fees are not due under the contract because Delta failed to complete the work, and completion is a condition precedent to invoking this provision in the contract. We find no merit in this contention because Delta was prevented from "completion of the work" by the actions of Red Ball-English. In our view, defendants' position would have merit only if Delta had refused to complete the job, but when it was prevented from so doing, we cannot conclude this constitutes an abandonment by Delta that would vitiate the quoted provision of the contract.
Red Ball-English further argues attorney's fees cannot be awarded when the claim is debatable and when plaintiff recovers less than the amount claimed in its petition. Counsel points out Delta sued for $46,284.80 and was awarded a judgment of $41,098.54. Defendants rely on the decisions in R. J. Ducote Contractor, Inc. v. L. H. Bossier, Inc., La.App., 192 So.2d 179 (1966) and Mayeaux v. Lamco, Inc., La.App., 180 So.2d 425 (1965). In both cases cited, the court was concerned with *590 an award of attorney's fees under LSA-R.S. 38:2246, a section of the Public Contracts Act. While it is true the court concluded attorney's fees were only allowed if the full amount of the claim was recovered, it reached this result because the statute itself specifically provides the claimant must recover the full amount of his claim in order to be entitled to attorney's fees. Thus both decisions are inapposite to the instant case.
Plaintiff correctly points out that this court has awarded attorney's fees provided for in a contract, even though plaintiff did not recover the full amount claimed in the suit. This was done in Snow-White Roofs, Inc. v. Boucher, La.App., 182 So.2d 846.
We conclude that under the agreement between Delta and Wooldridge, plaintiff is entitled to "reasonable" attorney's fees. Considering the complex nature of this suit, the length of time consumed in preparing the case for trial, trial of the matter on the merits and preparing and arguing this matter on appeal, it is our view that attorney's fees should be set at $10,000.00. Since Wooldridge is bound by its agreement to pay this amount, it is an additional item of damage suffered by it for Red Ball-English's breach, and accordingly, Wooldridge is entitled to a judgment against Red Ball-English in the amount it (Wooldridge) is condemned to pay Delta in attorney's fees.
We next consider Delta's contention that we erred in failing to award it interest on the judgment at the rate of 8%. In the Delta-Wooldridge contract, it is stated the parties "* * * do agree to pay interest on any amount which remains unpaid ten (10) days after date of billing at the rate of eight per centum (8%) per annum * * *." The record reflects that on July 10, 1964, Delta submitted a bill for some $45,000. This was never paid. Within a few days of this invoice Delta was dismissed from the job.
Defendants contend there was no final billing; therefore, plaintiff is not entitled to the 8% interest provided for in the agreement.
In view of the fact that Delta's invoices of April 1964 and July 1964 were not paid, and that the contract was breached by Red Ball-English a short time after the last invoice was rendered, we conclude plaintiff was not required to submit yet another invoice before it was entitled to interest at the rate stipulated in the contract. At this point to require an additional billing as a condition precedent to recovering contractual interest would be to require the plaintiff to perform a vain and useless act.
In our original opinion we have determined that as of July 10, 1964, the sum of $41,098.54 was due Delta. Since the agreement stipulates interest shall run at the rate of 8% on any unpaid balance beginning ten days after billing, we conclude that our original decree should be amended to provide for 8% interest per annum on the amount awarded beginning July 20, 1964 and continuing until the judgment is paid.
Likewise, Wooldridge is entitled to a judgment against Red Ball-English for the amount of interest it is required to pay to Delta under the paving contract and our decree should be amended accordingly.
The final question for our redetermination was posed in this manner by us in our decree granting the rehearing:
"What amount of damage, if any, is Wooldridge Construction Company entitled to recover in addition to the amount stipulated between the parties?"
During the trial of this matter, it was stipulated between counsel for Wooldridge and counsel for Red Ball-English that $56,804.69 was due Wooldridge for work performed on the terminal other than paving. We originally awarded Wooldridge this amount, subject to a credit of $400 which credit represented *591 the 10% commission due the prime contractor for the remedial work on the paving work. We misconstrued the stipulation to include the sum due for work performed, including paving, thus the $400 credit was improperly allowed to the defendant owners.
Wooldridge asserts its judgment should be amended to include the following items:

Profit on work performed by Delta for which Court
awarded $41,098.51. $4109.85
Costs expended to determine paving defect. 1500.00
Profit on costs expended to determine paving defect. 150.00
Profit on remedial work on paving. 400.00
Ten percent lost profit on uncompleted paving work. 1000.00

The owners contracted with the general contractor to erect the terminal on a cost plus basis, i. e., the contractor was to be reimbursed the costs expended in construction, plus a 10% profit on costs expended.
Considering the first item Wooldridge claims the Court failed to award as damages, we reiterate here that the prime contractor was found technically liable for $41,098.51, representing paving furnished on the job site by Delta before the contract was breached. Undoubtedly Wooldridge was entitled to the ten percent profit on this amount under the cost-plus contract. Therefore, we conclude our judgment should be amended to include the sum of $4109.85 as profit due to the general contractor from Red Ball-English.
The next two items Wooldridge seeks to recover are (1) its cost expended in ascertaining paving defects; (2) the ten percent profit due on item 1. A mistake had been made in the paving work; however, we conclude that a contractor who works on a cost-plus basis is not required to bear the cost of correcting defects. In Schroeter v. O'Steen, La.App., 94 So.2d 556, at page 558, the Court stated:
"* * * Unquestionably, we think, on a `cost plus' basis, some mistakes will be made on a job and certain work would have to be altered or changed so as to meet standard requirements. In the absence of an express agreement providing such repair work shall not be included in the basic cost of a `cost plus' undertaking, we think the item complained of has a proper place in the cost of the job."
In conformity with this reasoning, we are of the opinion that Wooldridge is entitled to an additional award of $1650.00, representing its cost to ascertain the problem with the paving and its ten percent profit on the money it expended therefor.
The final items Wooldridge contends are due as damages by the owners are (1) the $400 representing lost profit on the remedial work on the paving and (2) $1000 profit it would have earned had it been permitted to complete the contract.
Wooldridge concedes the owner had a right to cancel the contract at its pleasure under Civil Code Article 2765, which provides:
"The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require."
However, it asserts that before the contract may be terminated, the owner must pay as damages profit on the incomplete work had the contractor been permitted to perform.
*592 Counsel for Wooldridge cited the following cases to support this proposition: Minyard v. Culotta, La.App., 128 So.2d 797; Housecraft Division of Southern Siding Co. v. Jones, La.App., 120 So.2d 662; Vazquez v. Gairens, La.App., 26 So.2d 319; Dugue v. Levy, 114 La. 21, 37 So. 995; Wickliffe v. Cooper & Sperier, 167 La. 689, 120 So. 52; Gowan v. Stone & Webster Engineering Corp., 217 La. 1085, 48 So.2d 95; Cusachs & Co. v. Sewerage & Water Board of N.O., 116 La. 510, 40 So. 855.
In our view none of these cases are apposite because none involve a "cost plus" contract. The parties to the contracts therein involved had bid a fixed amount to complete a job. The "cost plus" contractor is employed in a supervisory capacity. Unlike the contractor who undertakes a job on a bid figure, he is permitted reimbursement for remedial work needed during the course of performing the contract. Thus, when the proprietor cancels, we think the "cost plus" contractor is entitled to reimbursement for labor and materials on work completed, and the profit thereon, at the time the contract is cancelled. In addition the "cost plus" contractor is entitled to "* * * such damages as the nature of the case may require." We do not think this includes profit on remedial work not performed, or anticipated profit on work that would have been required to complete the contract had not the proprietor cancelled because the costs on work not performed were never expended and the contractor's supervisory services were not rendered.
For the reasons hereinabove discussed, we also find no merit in Wooldridge's contention that he is entitled to a ten percent profit on the attorney's fees assessed. This was not a cost expended by him before the termination of the agreement with the owners, and he is fully compensated by the judgment awarding him reimbursement of attorney's fees and interest on the third party complaint.
For the reasons assigned, the judgment rendered in our original opinion is amended as follows:
Judgment is hereby rendered in favor of Delta Paving Company and against Elmer Wooldridge, d/b/a Wooldridge Construction Company, Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc. and English Realty Company, Inc., solidarily in the full sum of $41,098.54, together with 8% interest thereon from July 20, 1964 until paid, plus attorney's fees of $10,000.00 as stated in this judgment.
Judgment is further rendered herein in favor of Elmer Wooldridge, d/b/a Wooldridge Construction Company and against Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc., and English Realty Company, Inc., solidarily for any amount which Wooldridge may be forced to pay Delta Paving Company pursuant to this judgment.
Judgment is further rendered in favor of Elmer Wooldridge, d/b/a Wooldridge Construction Company and against Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc. and English Realty Company, Inc., in the full sum of $62,564.54, representing $56,804.69 stipulated as due by the parties, $4,109.85 representing profit on the paving contract and $1650.00 representing cost and profit in determining defects in paving, together with interest from judicial demand until paid.
All costs of the proceeding are to be paid by Red Ball Motor Freight, Inc., Red Ball Motor Freight Southeast, Inc., and English Realty Company, Inc.
Original decree amended in part and reinstated in part.
NOTES
[1] The trial court in reaching this result relied on the rationale of R.C.C. Article 21 which reads: "In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."
[2] R.S. 9:4802 and R.S. 9:4812; Rathborne Lumber & Supply Co. v. Falgout, 218 La. 629, 50 So.2d 295 (1950); Gurtler, Hebert & Co. v. Marquette Casualty Co., 145 So.2d 145 (La.App.1962); Baton Rouge Lumber Company v. Gurney, 173 So.2d 251 (La.App.1965).
[3] Snow-White Roofs, Inc. v. Boucher, 182 So.2d 846 (La.App.1966).
[4] La.C.C. Art. 1933; Binnings Construction Co v. Louisiana Life Ins. Co., 139 So.2d 561 (La.App.1962).
[5] See Montague v. Milan, 67 So.2d 351 (La.App.1953); Spicuzza v. Ranzino, 73 So.2d 208 (La.App.1954); Jones v. Tusa, 100 So.2d 799 (La.App.1958); Snow-White Roofs, Inc. v. Boucher, 182 So.2d 846 (La.App.1966).
[6] Appalachian Corporation v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1922).