U. S. for the Use and Benefit of
Dundee Cement Company

v.

WARREN BROTHERS COMPANY, a Division of Ashland Oil, Inc., and Insurance Company of North America.

Civ. A. No. 71–379.

United States District Court,
M. D. Louisiana.

Oct. 26, 1973.

H. Sloan McCloskey, Eugene G. Taggart, Andrew P. Carter, Monroe & Lemann, New Orleans, La., for Dundee Cement Co.

Frederick B. Alexius, Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

E. GORDON WEST, District Judge:

Defendant, Warren Brothers Company, entered into a contract with the United States Army Corps of Engineers for the construction of what is known as articulated concrete mattresses, devices used in river bank stabilization in flood control projects along the Mississippi River. The concrete mattresses were cast by Warren Brothers at their plant in St. Francisville, Louisiana. Warren Brothers Company then entered into a contract with the plaintiff, Dundee Cement Company, pursuant to which plaintiff was to furnish the cement necessary for Warren Brothers to mix the concrete and fabricate the mattresses. At the completion of the project the plaintiff brought this suit against Warren Brothers and its surety, Insurance Company of North American, demanding the sum of $29,240.15 for what it alleges to be underpayment for cement furnished by the plaintiff pursuant to its contract with Warren Brothers. Plaintiff sought to invoke the jurisdiction of this Court under the Miller Act, 40 U.S.C. § 270a, which grounds for jurisdiction were contested by the defendants. Prior to trial, this Court resolved the Miller Act jurisdictional question in favor of the defendants and dismissed the Insurance Company of North American as a party defendant. The undisputed evidence established the fact that bid requirements for the job did not require that a payment bond be furnished and that in fact, no payment bond was furnished. Insurance Company of North America, as surety for Warren Brothers, furnished only a performance bond, which ran in favor of the United States Corps of Engineers and not in favor of any materialmen.

From the evidence it was apparent that pursuant to the provisions of 40 U.S.C. § 270e, the requirement of a payment bond had been waived, and thus the plaintiff had no claim under the Miller Act. But the requisite diversity of citizenship and jurisdictional amount was involved to give this Court jurisdiction under 28 U.S.C. § 1332, and the plaintiff's case against Warren Brothers was thus tried to this Court, without a jury, as a breach of contract case. The defendant had made a counterclaim against the plaintiff for damages allegedly caused by the plaintiff's failure to make deliveries of cement on time, and the plaintiff answered this counterclaim by another counterclaim for demurrage costs, which it claimed were occasioned by failure of the defendant to accept deliveries when made. But before trial commenced, both of these counterclaims were abandoned and no longer form a part of this case.

The gist of the plaintiff's claim is that it shipped 198,815 barrels of cement to the defendant, but the defendant has only agreed to pay for 182,712 barrels, leaving a total of 16,103 barrels unpaid for. However, the plaintiff says that it cannot account for 8,092 of these unpaid for barrels of cement unless that loss be attributed to spread and yield loss for which the plaintiff admits the defendant would not be liable under the contract, and so it, the plaintiff, is not asking the defendant to pay for these 8,092 barrels. But as for the remaining 8,011 barrels of cement, the plaintiff contends that there is ample evidence to justify the conclusion that the concrete mixed by the defendant was over-batched to the extent of 8,011 barrels of cement and that thus the defendant should be held liable for payment for that cement. The defendant denies any over-batching (using cement over and above that called for in the concrete specifications) and alleges further that even if some over-batching did occur, that that possibility was taken into consideration in the contract fixing the price to be paid by defendant for the cement furnished by the plaintiff. While much evidence was introduced concerning whether or not over-batching did in fact occur, under the circumstances of this case, it is not necessary to resolve that question.

A contract was entered into between the plaintiff and the defendant whereby the defendant would purchase from the plaintiff "approximately 192,000 barrels of cement." After stating that the price of the cement was $3.65 per barrel subject to a $.20 per barrel discount if invoices were paid on or before the 10th day of the month following shipment, the contract went on to provide:

> "For the purpose of payment, however, barrels will be determined in the following manner:
>
> > "Full payment for cement delivered to this project will be determined as 104 percent of barrels paid for by the USCE [U.S. Corps of Engineers]. Regardless of the barrels shipped and/or invoiced, the effect of this agreement is that the cement paid for by Warren Brothers Company will be 4 percent more than that amount accepted and paid for by the USCE.
> >
> > "Warren Brothers Company agrees to pay by monthly statement for the barrels shipped to the job by barge draft weight. These draft weights will be adjusted at the termination of the contract and payment to Dundee will be made based on the amount of barrels paid for by the USCE, plus the 4 percent as stated above."

It is an undisputed fact that the United States Corps of Engineers paid for 174,242 barrels, and that the defendant, Warren Brothers, was obligated to pay for these 174,242 barrels plus 4 percent thereof, or an additional 6,970 barrels. It is also undisputed that the defendant received and was obligated to pay for an additional 1,500 barrels of cement that it received and furnished to another contractor, one Lambert. Thus, there is no dispute about the fact that Warren Brothers was obligated, by its contract with the plaintiff, to pay, at the stipu-

lated rate, for 182,712 barrels of cement. But now the plaintiff says that it actually shipped 198,815 barrels, or 16,103 barrels more than the defendant has paid for. Plaintiff says that it is willing to absorb a loss of 8,092 barrels over and beyond the 104 percent of what was paid for by the Corps of Engineers as it concludes that that amount constituted a "spread and yield loss" taken into consideration when the 104 percent figure was agreed upon, even though that "spread and yield loss" amounted to more than was anticipated. But the plaintiff says that the remaining 8,011 barrels furnished but unpaid for was the result of defendant over-batching its concrete, and that this factor was not considered when the 104 percent figure was agreed upon.

It is difficult to understand, from the evidence in this case, how the plaintiff can, under the terms of its contract with the defendant, differentiate between a "spread and yield loss" and a loss occasioned by over-batching, if indeed any such over-batching did occur, when neither of these terms are in any way referred to or mentioned in the contract. The evidence makes it clear that the settings on the batcher machine were made daily by the Corps of Engineers, and those settings could not be changed by the defendant. Warren Brothers had no control over the batcher settings and it was for this reason, among others, that the price to be paid by the defendant for the cement was pegged to the cement paid for by the Corps of Engineers. There is little doubt but that as far as the plaintiff was concerned, it was the 4 percent extra that the defendant agreed to pay that induced it to enter into this contract. If the plaintiff was lucky, it stood to make a 4 percent bonus, and if it was not so lucky, any losses would at least be offset to the extent of the 4 percent bonus which the defendant agreed to pay over and above the actual amount of cement paid for by the Corps of Engineers.

The contract in question is clear and unambiguous. It says in no uncertain terms that regardless of the number of barrels of cement shipped by the plaintiff, or invoiced by the plaintiff, the full payment for which the defendant, Warren Brothers, is to be liable, is 4 percent more than the amount of cement actually paid for by the Corps of Engineers. There is nothing in the contract to indicate that the 4 percent bonus was to cover only "spread and yield loss," and not other possible losses such as over-batching. The defendant has never contested its obligation to pay, under this contract, for cement furnished by the plaintiff to the extent of 104 percent of that actually paid for by the Corps of Engineers. This is all that the defendant is required to pay under the clear terms of its contract with the plaintiff.

Article 1901 of the Louisiana Revised Civil Code provides that:

"Agreements legally entered into have the effect of laws on those who have formed them. They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law. They must be performed with good faith."

There is no contention being made here that by mutual consent this contract was ever revoked, nor is there any contention that the contract could be revoked for "causes acknowledged by law." Therefore, the contract must be "performed with good faith."

Article 1945 of the Louisiana Revised Civil Code provides that courts are bound to give legal effect to all legal agreements according to the true intent of the parties, and that the intent is to be determined by the words of the contract when these words are clear an explicit and lead to no absurd consequences. Surely the words of this contract are "clear and explicit" and they certainly do not lead to "absurd consequences." Nothing in the evidence presented to this Court gives the slightest indication that there was ever any question as to the intent of these parties when they executed the contract in question. The defendant, by agreeing to pay 4 percent over the

actual amount paid by the Corps of Engineers, was protecting itself against possible greater losses, while the plaintiff, by accepting that formula for payment, was hoping to come out with a 4 percent bonus. Neither side may demand that the terms of a clear and unambiguous contract be abrogated under the guise of seeking equity. Article 1963 of the Louisiana Revised Civil Code provides:

"When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent, nor can any law operate to that effect, unless it be some prohibition or other provision, which the parties have no right to modify or renounce."

The intent of the parties is evident upon the face of the contract and there is no claim that its purpose is unlawful. Neither equity nor usage may now be relied upon to alter its terms. This contract is the law between the parties and must be held to be binding as such. See Tower Communications Co. v. ETCO Engineers Testing Laboratory, Inc., 261 F. Supp. 675 (E.D.La.—1966); R. J. Ducote Contractor, Inc. v. L. H. Bossier, Inc., 192 So.2d 179 (La.App.1st—1966).

The United States Corps of Engineers accepted and paid for a total of 174,242 barrels of cement and according to the clear terms of the contract, the defendant is obligated to pay the plaintiff for 104 percent of that amount, or 181,212 barrels, together with an additional 1,500 barrels that is not in dispute, or a total of 182,712 barrels. The defendant has either paid for this amount or does not deny its liability therefor. The plaintiff is not entitled to recover from the defendant payment for an additional 8,011 barrels simply because the contract by which both parties are bound does not provide for it.

For these reasons, there will be judgment entered in this case in favor of the defendant, rejecting the demands of the plaintiff, and dismissing this suit at plaintiff's cost.